Slip Op. 09 - 116

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                        :
SAHA THAI STEEL PIPE (PUBLIC)           :
COMPANY LTD.,                           :
                                        :
                 Plaintiff,             :
                                        :
          v.                            :      Before: R. Kenton Musgrave, Senior Judge
                                        :
UNITED STATES,                          :      Consol. Court No. 08-00380
                                        :
                 Defendant,             :
                                        :
          and                           :
                                        :
ALLIED TUBE AND CONDUIT CORP.,          :
and WHEATLAND TUBE COMPANY,             :
                                        :
          Defendant-Intervenors.        :
                                        :
```

## OPINION AND ORDER

[On the parties' consolidated motions for judgment upon an administrative record of an antidumping duty review of certain welded carbon steel pipes and tubes from Thailand, matter remanded to the International Trade Administration, U.S. Department of Commerce, for further proceedings.]

Dated: October 15, 2009

*O'Melveny & Myers LLP* (*Greyson L. Bryan*), for the plaintiff.

*Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Jane C. Dempsey*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Joanna V. Theiss*), of counsel, for the defendant.

*Schagrin Associates* (*Roger B. Schagrin*, *Jeffrey E. Farrah*, *John W. Bohn*, and *Michael J. Brown*), for the defendant-intervenors.

Musgrave, Senior Judge:  This opinion considers consolidated actions filed by Saha Thai Steel Pipe (Public) Co. Ltd. and by Allied Tube and Conduit Corporation and Wheatland Tube Company to challenge certain findings of the defendant International Trade Administration, U.S. Department of Commerce ("Commerce") in *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 61019 (Oct. 15, 2008), Public Record Document ("PDoc") 59.  The administrative review covers the period of March 1, 2006 through February 28, 2007 ("POR"), and the parties' specific complaints concern the application and consequences of the duty drawback adjustment statute to Saha Thai's export price ("EP") during the administrative review.  *See* 19 U.S.C. § 1677a(c)(1)(B) (requiring upward adjustment of EP by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of exportation of the subject merchandise to the United States").[1]

---

[1] For further background, *cf.* 19 U.S.C. § 1677b(a) (EP or constructed export price is compared with statutory "normal" value in order to calculate antidumping margin), *with* 19 U.S.C. § 1677b(b)(1) (normal value excludes home market sales transacted at less than the cost of production, and if no above-cost sales remain it is based on constructed value), *and* 19 U.S.C. § 1677b(f)(1)(A) (cost of production, in turn, "shall *normally* be calculated based on the records of the exporter or producer of the merchandise if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise") (court's italics).

Saha Thai also adds that Article 2.2 of the World Trade Organization Antidumping Agreement affirms the practice that "costs shall *normally* be calculated on the basis of records kept by the exporter or producer under investigation, provided that such records are in accordance with the generally accepted accounting principles of the exporting country and reasonably reflect the costs associated with the production and sale of the product under consideration."  Pl.'s 56.2 Mot. Br. at 10-11 (quoting WTO Antidumping Agreement ¶ 2.2.1.1) (court's italics).  Commerce's Statement of Administrative Action also observed that this provision "reflect[s] current U.S. practice and improv[es] on the 1979 Code[.]"  Statement of Administrative Action on the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809, 4152 (1994).

Jurisdiction here is pursuant to 28 U.S.C. § 1581(c).  The parties' contentions will

be addressed in logical turn, pursuant to the familiar standard of review requiring that such agency

determinations be upheld unless unsupported by substantial evidence on the record or otherwise not

in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  *See* 19 U.S.C. § 1516a(a)(2)(B)(iii).

### *Discussion*

### I

Commerce employs a "two-prong [*sic*]" test for the duty drawback adjustment that

requires a respondent to demonstrate (1) that the rebate and import duties are dependent upon one

another, or in the context of an exemption from import duties, that the exemption is linked to the

exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material

to account for the duty drawback on the exports of the subject merchandise.  *See* Issues and Decision

Memorandum ("IDM"), PDoc 57 at 3 (Oct. 6, 2008); *see, e.g., Allied Tube and Conduit Corp. v.

United States*, 29 CIT 502, 506, 374 F. Supp. 2d 1257, 1261 (2005) ("*Allied Tube II*").[2]  During the

POR, Saha Thai again participated in a duty drawback program sponsored by the Government of

Thailand ("GOT") pursuant to which materials "imported" into bonded warehouses are "exempt"

from Thai import duties to the extent the "imported" materials are incorporated into merchandise that

is then exported.  *See, e.g.*, Confidential Record Document ("CDoc") 1 at C-38, Exhibit C-5.  The

domestic producers agree that Saha Thai satisfied the two-pronged test, as applied in this instance,

but they allege the test itself is unlawful.

_____

[2] Familiarity with prior litigation over the test is presumed.  *See, e.g., Wheatland Tube Co. v. United States*, 30 CIT 42, 414 F. Supp. 2d 1271 (2006); *Allied Tube II, supra*; *see also Allied Tube and Conduit Corp. v. United States*, 25 CIT 23, 27-30, 132 F. Supp. 2d 1087, 1092-95 (2001) ("*Allied Tube I*").

Focusing attention on the statutory language "imposed by the country of exportation," the domestic producers argue that the two-pronged test "improperly increases EP by the amount of the drawback, rather than properly by the amount of the *cost advantage to exports*, if any, as a result of drawback." Def.-Ints.' 56.2 Mot. Br. at 4-5, 11-12 (court's italics). They contend that if proof of "actual payment" of import duties is not required under the statute,[3] then at a minimum some form of "payable" is (*i.e.*, an obligation to pay "imposed" upon the importer). Def.-Ints.' Reply at 3. For this argument to prevail, however, the referenced language must either be plain, and Commerce's execution of it inconsistent therewith, or, if it is ambiguous, Commerce's interpretation of it must be unreasonable. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Responding, the government contends that when read as a whole, "this statutory provision *expressly* requires Commerce to include in [EP] import duty drawback *programs* 'which have been rebated, or which have not been collected, by reason of exportation of the subject merchandise to the United States.'" Def.'s Resp. at 12 (quoting 19 U.S.C. § 1677a(c)(l)(B)) (court's italics). Strictly speaking, however, this is not so: the statute references only import duties, not import duty programs. And although the government avers that the GOT "imposed" an import duty that was "not collected" (because "import duties were required to be paid if such products were imported into Thailand for sale o[r] domestic consumption"), *id*., if that is so, then it is not

---

[3] *See, e.g., Wheatland Tube*, 30 CIT at 62, 414 F. Supp. 2d at 1288 (rejecting contention that a respondent must demonstrate the payment of duties upon raw materials used to produce merchandise sold in the home market as a prerequisite to receiving the duty drawback adjustment); *Allied Tube II*, 29 CIT at 510, 374 F. Supp. 2d at 1262 ("[t]he clear language of 19 U.S.C. § 1677a(c)(1)(B) does not require an inquiry into whether the price for products sold in the home market includes duties paid for imported inputs").

unreasonable to expect, as the domestic petitioners argue, that an obligation that is *actually* imposed would be carried in some form *somewhere* (*e.g.*, on a respondent's books and records) until such time as the obligation is satisfied or removed.

The domestic producers emphasize that import duty "liability" is not actually "finalized . . . until the provisional duty was drawnback on export, the input was consumed in production or sold in the home market, or the period for claiming drawback expired." Def.-Ints.' Reply at 15. They also point out that as a matter of fact, the manner of operation of the GOT duty drawback program means that import duties are never "imposed" on or "incurred" by Saha Thai on imported materials, and they further emphasize that Saha Thai *itself* stated that entries into the bonded warehouse do not establish "a real, or even a possible, future cost." Therefore, they contend, "provisional" import duties were never "established" from which "drawback" could lawfully occur "because this merchandise was not imported and . . . no obligation to pay import duties was ever imposed on merchandise that entered the bonded warehouse[.]" Def.-Ints.' 56.2 Mot. Br. at 36. *See also*, *e.g.*, *id*. at 2-3, 5-7, 15.[4] They aver that Commerce's practice considers only the provisional import duties that *are* rebated or are *not* collected by reason of export and therefore Commerce's practice cannot determine in accordance with the language of the statute "the amount of import duties imposed by the country of exportation" because the practice does not consider the provisional import duties that are *not* rebated or *are* collected. *Id*. at 12, 21 (Def.-Ints.' italics).

---

[4] *E.g.*, "When there are no import duty payments or costs there is no *cost advantage to exports* and thus no increase to EP is appropriate." Def.-Ints.' 56.2 Mot. Br. at 9 (court's italics). Further, they contend, it is inconsistent, if not hypocritical, for Commerce to take the position *vis a vis* their claim that *no* import duty cost is required for an increase to EP while simultaneously espousing the *opposite* position *vis a vis* Saha Thai's claim (discussed *infra*) that whenever there is an increase to EP under the duty drawback provision an import duty cost *is* required. *Id*. at 9-10 n.6.

For the most part, the court fails to appreciate the distinctions. If there are any, the argument does not appear to prove that the meaning of section 1677a(c)(1)(B) is "plain," and if the provision is ambiguous, the argument does not appear to demonstrate that Commerce's interpretation, as embodied in the two-pronged test, is unreasonable, at least insofar as the interpretation resolves the inherent tension between "imposed" and "not . . . collected" in the statute.

Basically, the domestic producers dispute Commerce over the burden of proof required to show the legal "imposition" of import duties. They are correct in asserting that the duty drawback adjustment provision requires that import duties be "imposed by the country of exportation," but where their argument strays is in the proposition that such language, along with "rebated . . . or . . . not . . . collected," *plainly* requires that more needs to be done to prove "imposition" than to demonstrate (1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise, *i.e.*, Commerce's two-pronged test. It is not illogical to infer, from proof of a certain import-duty-and-drawback regime, proof of a certain amount of non-domestic material inputs subject to such regime, proof of the applicable import duties on such inputs pursuant to such regime, proof of a certain amount of exported further-finished products, and proof of the amount of incorporation of such inputs therein, such as were apparently administratively considered here, as to the amount of "import" duties that are "rebated . . . or . . . not . . . collected, by reason of exportation[.]" The amount of import duties "imposed" on materials entering and exiting a bonded warehouse subject to such an import-duty-and-drawback regime is ascertainable, and the two-pronged test is suited to such discovery.

The court, thus, cannot fault the logic behind the test. Such "ascertainable" duties are, as the government argues, "imposed by the country of exportation," either by inference or implication, in the context of bonded warehouse production subject to the exporting country's duty drawback regime. *See* Def.'s Resp. at 9. In that sense, the first of the two prongs of the test does indeed "focus" on import-duty imposition. Further, it is not "obvious" that "imposed by the country of exportation" along with "rebated . . . or . . . not . . . collected" means "the methodology proposed by domestic parties[, which would] increase[ ] EP by the cost advantage to exports, if any, that results from drawback[.]" Def.-Ints.' Br. at 27.

The domestic producers' argument may have a certain appeal, from an economic, accounting, or logical standpoint, but the language of the statutory provision does not provide such certainty, and the argument also conflicts with the other statutory requirement that the costs of production be based on the books and records of the exporter or producer if they are in accordance with the generally accepted accounting principles of the country of export and "reasonably reflect" such costs. *See* 19 U.S.C. § 1677b(f)(1)(A).[5] If the domestic producers' point is that Saha Thai does not maintain among its books and records an account for "provisional" import duties in anticipation of their "rebate" or non-collection (when subject merchandise incorporating the inputs bearing such "imposed" provisional import duties is exported) and therefore its books and records do not reasonably reflect costs of production, the point concerns foreign like product (*infra*), and if the point is that their interpretation (*supra*) is rather the "more reasonable" solution, it is a task for Congress

---

[5] It is a matter for Commerce to make the initial determination of whether "such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." *See* 19 U.S.C. § 1677b(f)(1)(A); *see also infra*.

to require or Commerce to implement because this Court is not free to disagree with that agency over

an "apparently" reasonable interpretation of the antidumping statute the agency is charged with

administering.  *See*, *e.g.*, *United States v. Eurodif S.A.*, 129 S.Ct. 878, 886 (2009); *Chevron*, *supra*.

Considering the other points raised in the briefs, including the domestic producers'

argument that the two-pronged test conflicts with *dicta* in *Huffy Corp. v . United States*, 10 CIT 214,

215-16, 632 F. Supp. 50, 52-53 (1986) (commenting that the market cost advantage to exports from

drawback is the proper measure for increasing EP) and *Carlisle Tire and Rubber Co., Div. of

Carlisle Corp. v. United States*, 11 CIT 168, 169, 657 F. Supp 1287, 1288 (1987) ("[t]he statute does

not authorize an adjustment in whatever amount is refunded by the exporting country"), in the

interest of brevity the court merely notes in passing that they rather only tangentially address the

precise issue the domestic producers raise.[6]

II

Saha Thai's complaint is in one respect the mirror image of the domestic producers'

complaint: Commerce ultimately included an amount for Saha Thai's "unpaid, exempted" import

duties in the margin calculation.  PDoc 58 (Oct. 6, 2008).  Commerce's rationale was that the

"exempted duties and rebate 'revenue' are real costs and revenues faced by the company[.]"  Because

---

[6] For example, the domestic producers also contend that the import duties that were imposed on a small amount of steel coil that was imported into the Thai customs territory should not be included in the analysis because the steel coil was resold without being used in production of subject merchandise, but also that "Commerce has a longstanding practice of requiring that the inputs which qualify for drawback are *capable* of being used in producing the subject merchandise by the respondent."  Def.-Ints.'-Ints' 56.2 Mot. Br. at 35 (referencing *Certain Welded Carbon Steel Pipes and Tubes from Taiwan*, 51 Fed. Reg. 43946 (Dec. 5, 1986) (final admin. review results) (comment 2) (court's italics)).  On its face, that leaves latitude.  In any event, the implication is off the mark because, as the government points out, the import duties imposed on that merchandise were apparently not included in the duty drawback calculation anyway.  *See*, *e.g.*, Def.'s Resp. at 13.

of the upward adjustment to export price from the duty drawback adjustment, Commerce concluded

that the unpaid/exempted import duties are appropriately added to Saha Thai's costs of production

and constructed value in accordance with departmental "policy." *See* IDM, PDoc 57 at 14. Saha

Thai complains the such duties were merely theoretical and were never actually paid or accrued as

expenses on its books.

   In addition, although Commerce accepted Saha Thai's formula for calculating the

amount of duty drawback adjustment to EP,[7] Commerce rejected the GOT-mandated yield-loss

factors and instead used Saha Thai's actual yield-loss experience to determine the EP increase.

Commerce's stated rationale for the switch was that Saha Thai's yield loss factors "have been lower

than the Thai customs factors in the past two completed reviews." Saha Thai complains this

adjustment was also unlawful. Their combined effect was to increase Saha Thai's costs of

production and constructed value, resulting in additional home market sales being excluded from the

calculation of normal value and a final dumping margin of 4.26 percent. *See* 73 Fed. Reg. at 61020.

   The antidumping statute directs that the cost of manufacturing is to be determined by

including the "cost of materials and of fabrication or other processing of any kind employed in

producing the foreign like product" as well as the amounts of general expenses and profits incurred

in production and sale of that merchandise. 19 U.S.C. §§ 1677b(b)(3) & (e)(l). The statute is silent

or ambiguous, at least in those subsections, on whether "implied" costs are to be included, in

---

  [7] This involved multiplying the price paid for steel and zinc that entered Saha Thai's bonded warehouses by the Thai import duty rate of 5.0 percent for steel and 3.5 percent of zinc and by the yield factors specifying the amount of steel and zinc used to produce the subject pipe, and then dividing that amount by the quantity of steel and zinc inputs entering the bonded warehouses in order to establish a per-unit increase to EP claim. *Cf.* PDoc 43 at 5-6 & Ex. SR3-3 – SR3-4.

addition to "actual" (*e.g.*, realized or out-of-pocket) costs. *Cf. U.S. Steel Group[,] A Unit of USX*

*Corp. v. United States*, 21 CIT 761, 774, 973 F. Supp. 1076, 1088 (1997) (noting the absence of

statutorily defined cost of production). The Court must therefore defer to Commerce's interpretation

of the statute if it is based on a permissible construction. *Chevron*, *supra*, 467 U.S. at 843. *See, e.g.*,

*Solvay Solexis S.p.A. v. United States*, 33 CIT ___, ___, 628 F. Supp. 2d 1375, 1379-80 (2009)

(sustaining inclusion of "goodwill" in absence of showing of significant distortion).

        And yet, at the same time (and as mentioned) the antidumping statutes also oblige

Commerce to accept a respondent's reported costs if they are kept in accordance with local generally

accepted accounting principles unless the reporting methodology distorts the respondent's "true"

costs. *See, e.g.*, *Thai Pineapple Public Co. v. United States*, 187 F.3d 1362, 1366 (Fed. Cir. 1999).

Here, there is no evidence on the administrative record from which to infer that Saha Thai's financial

records are not kept in accordance with Thai GAAP. Commerce rather inferred that Saha Thai's

books and records do not "reasonably" reflect the costs of production. *See* Def.'s Resp. at 19.

        While that position is intrinsically at odds with what Commerce may have espoused

elsewhere and in the past,[8] Commerce may, of course, deviate from policy or practice if it provides

clear and rational reasoning therefor. *See, e.g.*, *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd.*

*of Trade*, 412 U.S. 800, 808 (1973); *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373

(2003). It has done so in this instance. *See* IDM, PDoc 57 at 14-16 (discussing, *inter alia*,

---

        [8] *See, e.g.*, *Viraj Group, Ltd. v. United States*, 25 CIT 1017, 1028-1029, 162 F. Supp. 2d 656, 667-68 (2001) (Commerce's denial of an adjustment to cost of production or constructed value sustained; the plaintiff "did not establish that any import duties offset by the ['duty entitlement passbook' program] benefits were ever included in the company's books and records as a cost of materials"); *see also* Pl.'s 56.2 Mot Br. at 11-17.

*Light-Walled Rectangular Pipe and Tube From Turkey: Notice of Final Determination of Sales at Less Than Fair Value*, 69 Fed. Reg. 53675 (Sep. 2, 2004) ("duty . . . should have been reflected in the company's books")).   A reasoned policy reversal is entitled to judicial deference, *e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991), and the court cannot conclude that the determination to include an amount for "unpaid, exempted" duties in Saha Thai's costs of production and constructed value was unreasonable or distortive (*e.g.*, by "double counting" the "imposed" duties), or that the record with respect thereto is unsupported by substantial evidence, because "cost" can encompass "charge," *i.e.*, an "obligation to pay," not only "payment."   *See Webster's New International Dictionary* 601 (2d ed. 1956); *see*, *e.g.*, *Cavalier Shipping Co., Inc. v. United States*, 57 Cust. Ct. 652, 658 (1966).

   However, to the extent Commerce granted a duty drawback adjustment in accordance with the GOT duty drawback regime, it was incorrect for Commerce to "pair" Saha Thai's actual monetary GOT duty drawback experience (in the EP calculation) with  Saha Thai's actual physical yield-loss experience (affecting normal value through the cost of production and constructed value calculations).   Saha Thai appears correct in arguing that the yield-loss ratios mandated by the GOT are Saha Thai's actual cost and revenue experience.   Disregarding that therefore equates to a countervailing duty determination in the context of an antidumping duty administrative review, which cannot be sustained.   *See Huffy Corp.*, *supra*, 10 CIT at 220, 632 F. Supp. at 55-56.   *Cf. Far East Machinery v. United States,* 12 CIT 972, 977, 980, 699 F. Supp. 309, 313, 316 (1988) ("[a]lthough it might have been preferable for ITA to use the actual scrap rates utilized by Taiwan rather than calculating it from other information . . ."); *Sawhill Tubular Div. Cyclops Corp. v. United States*, 11 CIT 491, 499-500, 666 F. Supp. 1550, 1556-57 (1987) (discussing *Huffy*).

### *Conclusion*

For the foregoing reasons, Commerce's determinations to increase Saha Thai's export price to account for the import duties drawn back on subject merchandise exported to the United States and to account, correspondingly, for the implied cost of import duties in Saha Thai's cost of production and constructed value are sustained, but the determination to base the adjustment on other than Saha Thai's actual duty drawback experience must be, and it hereby is, remanded for redetermination of Saha Thai's export price.

Results of remand shall be filed within 60 days. Comments thereon, or indication of none, shall be filed within 15 days thereafter. No rebuttal without leave.

**So ordered**.


        /s/  R. Kenton Musgrave
        R.  KENTON MUSGRAVE, Senior Judge


Dated: October 15, 2009
       New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____

Deputy Clerk